Hegney v. Head.

HEGNEY v. HEAD *et al.*, *Appellants.*

Division Two, February 12, 1895.

1. **Practice**: ACTION TO SET ASIDE WILL: JURY CHALLENGES.   Plaintiff,
in an action to set aside a will, should be required to announce his
jury challenges first, though the defendant has the burden of proof.

2. ———: ———: ———: HARMLESS ERROR.   The fact, however, that
the defendant was required to first announce his challenges will not
authorize a reversal of the judgment in the absence of any showing of
prejudice.

3. **Will**: SPIRITUAL ADVISER: UNDUE INFLUENCE.   Where a will is made
in favor of one's spiritual adviser to the total or partial exclusion of
the testator's lawful heirs, the burden of proof is on the devisee to
show that the testator possessed testamentary capacity and that the
will was not the result of undue influence.

4. ———: UNDUE INFLUENCE: PRESUMPTION.   No presumption of undue
influence arises from the mere fact that distant relatives or religious
or charitable institutions are made devisees to the partial exclusion
of lawful heirs.

*Appeal from St. Louis City Circuit Court.*—HON. D. D.
FISHER, Judge.

REVERSED AND REMANDED.

*T. J. Rowe* for appellants.

(1) The court should have required plaintiff to
announce his peremptory challenges first.   R. S. 1889,
sec. 6081.  (2) There is no evidence to support the
verdict and the instructions given by the court are
erroneous.   Undue influence is never presumed except
when one who occupies a confidential relation writes

the will himself in his own favor. *Sunderland v. Hood*, 84 Mo. 293; s. c., 13 Mo. App. 238.

*Virgil Rule* and *B. H. Charles* for respondent.

(1) It is not error to require proponents to make their peremptory challenges first. *Tinglez v. Cowgill*, 48 Mo. 291; *McMahon v. McMahon*, 100 Mo. 97; *Norton v. Paxton*, 110 Mo. 456; *State v. Knight*, 61 Mo. 373; *State v. Matthews*, 88 Mo. 121; *State v. Gleason*, 88 Mo. 582; *Vierling v. Stifel*, 15 Mo. App. 125; R. S. 1889, sec. 2303; *O'Brien v. Iron Works*, 7 Mo. App. 257; *State v. Hays*, 23 Mo. 287. (2) The verdict was in accordance with the overwhelming weight of the evidence, and the instructions were correct. *Muller v. Hospital Association*, 5 Mo. App. 390, 73 Mo. 242; *Maddox v. Maddox*, 114 Mo. 46; *Marx v. McGlynn*, 88 N. Y. 371; *Harney v. Sullens*, 46 Mo. 151; *Re Cahill*, 74 Cal. 52; *Gay v. Gillilan*, 92 Mo. 250; 1 Redfield on Wills, p. 530, sec. 43; *Hall v. Knappenberger*, 97 Mo. 509; *McFadin v. Catron*, 120 Mo. 252; *Jones v. Roberts*, 37 Mo. App. 174; *Carl v. Gabel*, 120 Mo. 297; 2 Pomeroy on Equity Jurisprudence, sec. 951.

Burgess, J.—This is a suit to set aside the will of Mary Fitzsimmons, late of the city of St. Louis. The will bears date September 28, 1892, and she died on the thirteenth day of October following, having reached the age of eighty. She left surviving her no children of her own, her nearest of kin, and heir, being the plaintiff, a grandson. The will is assailed on two grounds: *First,* want of mental capacity on the part of the deceased; and, *second,* undue influence exercised by defendants, and especially by the defendant Rev. J. J. Head, who was alleged to have been her confidential and spiritual adviser, and Rev. D. W. Kendrick who

wrote her last will.   The estate amounted to something over $4,500 in money and bonds.   The defendants are D. W. Kendrick, pastor and member of the Conference English Branch of St. Vincent's Parish, Little Sisters of the Poor, Sisters of St. Joseph, Thomas Smith, president of St. Mary's Seminary, D. W. Kendrick, pastor of St. Vincent's Church, J. J. Head, pastor of the Annunciation Church.

That portion of the will necessary to be considered is as follows;   ''I bequeath to my grandson, Robert P. Hegney, $1,500, for his maintenance and education at a Catholic college, when he arrives at the age of twelve years, together with the interest on this amount, after my death, for the same purpose;   but in case of death before this amount is spent on his education, I desire said amount to be given to the Conference English Branch of St. Vincent's Parish and the Little Sisters of the Poor, even shares for both, for the benefit of the deserving poor.   I give and bequeath to my little niece, Mary Lynch, of Philadelphia, $600, and in case of my grandson's death, I wish $400 to be added to this and give her $1,000;   and then after subtracting the said $400, I wish the balance divided as above, between the two societies above mentioned.   I bequeath to the Sisters of St. Joseph, Eighth and Marion streets, $500, for their kindness to me.   I also bequeath $500 to the president of the St. Mary's Seminary for helping to educate poor boys for the holy priesthood.   I also bequeath $200 each to the pastors of the St. Vincent's Church and the Annunciation Church, Sixth and LaSalle streets, for masses for the repose of my soul and those of my deceased relations.   I request that the Rev. J. J. Head act as the executor of this my last will and testament and such is my confidence in his goodness and integrity that I do not require him to give the usual bond and bail required by law for the

faithful exercise of said duty of executor. The residue which remains I wish to be given on deposit to Rev. D. W. Kendrick for the object which I have privately instructed him in carrying out, in accordance with my instructions to him.''

The answer of Mary Lynch is a general denial. The other defendants in their answer admit all the allegations in plaintiff's petition except that they deny that, at the time of the execution of the will, the testatrix was not of sound mind or disposing memory, or was not capable of making a will, or that she had been under the improper or undue influence of J. J. Head, or of any other person, or that she was under the exclusive care or influence of any of the defendants, and aver that the paper in question is the last will and testament of Mary Fitzsimmons. The trial resulted in a verdict setting aside the will, and the defendants appealed.

The evidence showed that the testatrix was very fond of the plaintiff, having a great affection for him; that she asked one of the witnesses, Katie Hennessy, a short time before the execution of her will, to go for Father Kendrick, saying that she would like to see him, to settle her business, as she did not think that she was going to live a great while; that she had been complaining quite a while, and was confined to her bed two weeks before she died; that Father Kendrick wrote the will in controversy, and that she was not in the room while he was doing so; that this witness signed the will as a witness at his request; that he was accustomed to call on Mrs. Fitzsimmons; that he had administered communion to her; that he was her confessor and had taken her confession; that he was pastor of her parish, St. Vincent's, and that Father Head was the pastor of the Annunciation Church; that she went to mass a short time before her death; that she could not write

her name, but made her mark, Father Kendrick guiding her hand, and that she was not then confined to her bed, but was going around.

Maggie Walsh, another attesting witness, testified that. at the time of signing the will, Mrs. Fitzsimmons asked Father Kendrick if he would attend to what she had privately instructed him, and he said: "I will carry it out to the letter, all your wishes." The attesting witnesses testified that the testatrix was of sound mind and that the will was her own free will.

The evidence, on behalf of the plaintiff, showed that two days before the death of the testatrix, her then agent, at her request, had turned over all of her money to Father Kendrick.

Father Head testified, in substance, as follows: That he was rector of the Annunciation Church; that he knew the testatrix four years before her death; that, for the last eighteen months of her life, she lived at the Home of the Immaculate Conception; that he drew a will for her in the spring of 1890, and another on November 14, 1891; that, about a month before her death, at her request, he went to see her, when she told him that she was going to make another will; that she did not say exactly what she wanted in it; that he told her that the will he had drawn for her was all right; that he "forbid her" making another will; that the boy, Robbie, was always uppermost in her mind, and that she said that she wanted to provide for him; that she did not know where her property and moneys were, nor what they were.

Rev. David W. Kendrick, one of the defendants, testified that he was pastor of St. Vincent's Church, and had known Mrs. Fitzsimmons ten or twelve years; that she called on him frequently, and died in his parish; that he called on her in the same way he would any sick person, to see them from time to time, to

know their spiritual condition, and called on her as her spiritual adviser. The witness also testified as follows:

"*Q.* You ministered to her as a priest, did you not? *A.* Yes, sir.

"*Q.* And you mean by that as a spiritual adviser? *A.* I don't know what meaning you attach to 'spiritual adviser.' I administered to her as a priest. There may be some other meaning attached, but I acted, rather, of course, as a spiritual adviser."

He further testified that he also acted as her confessor. He also stated that, "shortly after the will, she confessed;" that he found her very ill and prepared her for death; that, at the time he visited her in regard to the making of a will, "she didn't say anything about it (being a sick woman), because it was very evident, from her appearance, that she was a very sick person;" and that "she was in a very feeble condition." At the time, when he called on her to draw her will, he made a recommendation which resulted in a bequest of $500 to the president of St. Mary's Seminary, a Catholic school for young men; he also told her it would be better to divide the $400 left for saying of masses, and, instead of leaving it all to Father Head's church (the Annunciation Church), to leave $200 to Father Head's church, and $200 to his own church (St. Vincent's Church). Speaking of this clause, witness testified: "If it said the pastor of St. Vincent's Church, I was the person, but if it said St. Vincent's Church, it was left to St. Vincent's Church for masses."

He further stated that, at the time Mrs. Fitzsimmons executed the paper in contest, she was in a very feeble condition, and did not know exactly everything about her estate, but had papers to show. It was further shown, by this witness, that the clause in the will which provides that "the residue which remains

I wish to be given on deposit to Rev. D. W. Kendrick, for the object for which I have privately instructed him," was with respect to the plaintiff, and that he said to her when speaking of it, and a newspaper clipping shown to him by Mrs. Fitzsimmons, in reference to plaintiff's father, that he said: "I said to her, giving my reason, the child can live on the will until thirteen years of age, and wouldn't it be best to leave the residue, in case the father would not support him, for *the reason she* gave me. I read the paper and said nothing further in the matter, but afterwards I thought, from the contents of the paper, that the poor child might be neglected, and, consequently, I advised the residue to be given for that purpose. I was governed by the facts contained in the slip, solely." That she was in the habit of depositing her little savings with him.

Mrs. Fitzsimmons' daughter, Mrs. Hegney, plaintiff's mother, died when he was but an infant, during which time she was living with her daughter and had the care of him. She had a very kindly feeling for her son-in-law, plaintiff's father, and, although he called to see her on several occasions during her last illness, he was never permitted to do so.

On the part of the defendants, the evidence tended to show that, at the time of the execution of the will in contest, the testatrix was of sound mind, in possession of all her faculties, and that it was not obtained by fraud or undue influence. If there were any differences in the provisions of the former wills of Mrs. Fitzsimmons and the last one they are not disclosed by the record.

In selecting the jury to try the cause the court required the defendants, over their objections, to announce their challenges first, and in this it is claimed that error was committed.

Section 6081, Revised Statutes, 1889, provides that "In trials of civil causes each party shall be entitled to challenge, peremptorily, three jurors; but when there are several plaintiffs and defendants they shall join in their challenges, and the plaintiff shall, in all cases, announce his challenges first." The fact that the burden of proof was on the proponents who were entitled to open and close the argument before the jury, did not change the *status* of the parties and thereby deprive the defendants of the right, conferred on them by the express provisions of the statute, to have the plaintiff announce his challenges first. As a general rule, where the burden of proof rests upon the defendant, he has the right to open and close the argument, but he is not, because of that fact, required to announce his peremtory challenges first. Should the judgment be reversed for that cause?

By section 2303, Revised Statutes, it is provided that "The supreme court, or courts of appeals, shall not reverse the judgment of any court, unless it shall believe that error was committed by such court against the appellant or plaintiff in error, and materially affecting the merits of the action." No reason has been assigned by defendants how their rights were prejudiced by the action of the court in requiring them to announce their challenges first, but they rely solely upon the provision of the statute. The right to three peremptory challenges does not confer the right to select three or any other number of jurors, nor is there any claim or pretense that the jury that tried the case was not composed of competent persons. *State v. Hays*, 23 Mo. 287; *O'Brien v. Iron Works*, 7 Mo. App. 257. We do not think the error committed was one materially affecting the merits of the action, and that the judgment should be reversed for that reason.

It is next contended that there was no evidence of

mental incapacity of the testatrix, at the time of the execution of the last will, and that there was error committed in submitting that issue to the jury. It is evident, from the facts in proof, which have already been stated, and are unnecessary to again repeat, that this contention is not well grounded. The evidence was sufficient upon which to predicate an instruction upon that theory of the case, its weight being for the consideration of the jury, and upon this this court will not undertake to pass.

At the request of plaintiff, the court instructed the jury as follows:

"The jury are instructed that when a will is made in favor of one's spiritual adviser, or of one's confidential adviser, or of distant relations, or of religious or charitable institutions, to the total or partial exclusion of the lawful heirs, the burden of proof is on the defendants to show that the deceased was of sound mind and memory at the time of the execution of the will, and that it was not the result of undue influence."

It is argued by counsel for defendants that this instruction is erroneous, in that it imposed upon the defendants the burden of showing that the will was not the result of undue influence.

One possessed of testamentary capacity may dispose of his property as he pleases, and may, himself, select the objects of his bounty. There is no law which prohibits such a will, and, if fairly made, the law will uphold it; but it must be the free and voluntary act of the person executing it, and must not be procured by fraud or undue influence. It is only in certain cases, and under certain circumstances, that undue influence will be presumed, and, in order to vitiate a will on that ground, it must exist at the time of its execution.

In *Marx v. McGlynn*, 88 N. Y. 357, the facts were very much like the case at bar, and EARL, J., speaking

for the court, said: "But there are certain cases in which the law indulges in the presumption that undue influence has been used, and those cases are where a patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close, confidential relationships exist. Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and some proof should be required beside the *factum* of the will before the will can be sustained."

As was also said in that case, "we think this rule of law applies with great force in this case." When it is considered that defendant Kendrick wrote the will; that he was her confessor, and had taken her confession; that he had administered communion to her; that, by her request, all of her effects were turned over to him to take care of without bond of any kind; that Father Head, another defendant, was rector of the Annunciation Church; that the last eighteen months of her life she lived at the Home of the Immaculate Conception; that, after he had written two wills for her, she requested him to write another, when he forbid her doing so; that she gave to plaintiff, her only natural heir, only a small portion of her estate, and the remainder to the defendants, we think that the instruction placed the burden where it rightfully and legally belonged. *Muller v. St. Louis Hospital Ass'n*, 5 Mo. App. 390; s. c., 73 Mo. 242.

Another contention is that the following instruction, given on behalf of plaintiff, is erroneous:

"The jury are instructed that when a will is made in favor of one's spiritual adviser, or of one's confidential adviser, or of distant relatives, or of religious or charitable institutions, to the total or partial exclusion

of the lawful heir, the burden of proof is on the defendants to show that the deceased was of sound mind and memory at the time of the execution of the will, and that it was not the result of undue influence."

We do not understand that the law indulges the presumption that undue influence has been used in procuring the execution of a will in favor of distant relatives, or of religious or charitable institutions, even where there is a partial exclusion of the lawful heir. It is generally invoked where a patient makes a will in favor of his physician, a ward in favor of his guardian, a client in favor of his attorney, or where close, confidential relations exist, or where a person executes a will in favor of his priest or religious adviser. How a religious or charitable institution can, of itself, be guilty of fraud or undue influence in the procurement of the execution of a will we are unable to perceive, but that persons may exercise such influence in its favor is true. Such presumption may arise in the first place from a seemingly unjust discrimination in the provisions of the will in favor of strangers, against those entitled to the testator's bounty, and because of the confidential relations existing between the testator and the beneficiaries. In such circumstances the law raises the presumption that the will was obtained by undue influence, and it devolves upon them to show that no such influence was exerted over the mind of the testator at the time of the execution of the instrument. Such influence is usually acquired by acts of kindness, though sometimes by putting the testator in fear of some physical injury, or by poisoning his mind against those legally entitled to his bounty, acts that no religious or charitable institution could, of itself, perform; a kind of influence that it had no capacity to exercise, but which might be exercised by persons in its

favor, if such was the case. But that feature is not embodied in the instruction.

Plaintiff's second, third and fourth instructions are also criticised in that they do not correctly define undue influence. The objection we think rather technical, but, upon a retrial of the cause, we would suggest that the undue influence which is alleged to have dominated the mind of the testatrix in the execution of the will be confined to the time of its execution. The judgment is reversed and the cause remanded. All of this division concur.